**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE**

SIERRA CLUB, STATE WIDE ORGANIZING
FOR COMMUNITY EMPOWERMENT and
TENNESSEE CLEAN WATER NETWORK,

               Plaintiffs,

v.

NATIONAL COAL LLC,

               Defendant.

Nos.:  3:11-cv-515
        3:11-cv-516
        3:11-cv-527

**<u>CONSENT DECREE</u>**

**I.    RECITALS**

    1.    On October 31, 2011, Plaintiffs, Sierra Club, Statewide Organizing for Community Empowerment and Tennessee Clean Water Network (collectively "Plaintiffs") filed Civil Action Nos. 3:11-cv-515 and 3:11-cv-516 against Defendant, National Coal, LLC ("Defendant"). On November 7, 2011, Plaintiffs filed Civil Action No. 3:11-cv-527 against Defendant. Plaintiffs subsequently filed Amended Complaints in each action on November 8, 2012.

    2.    The Court consolidated Civil Action Nos. 3:11-cv-515, 3:11-cv-516, and 3:11-cv-527 on August 6, 2012.  The Court designated 3:11-cv-515 as the lead case.

3. The Amended Complaint in each action alleges that Defendant has discharged concentrations of pollutants in excess of effluent limitations contained in its National Pollution Discharge Elimination ("NPDES") Permits.

a. NPDES Permit TN0062961 regulates discharges from the Jordan Ridge Refuse Facility ("Jordan Ridge") and is at issue in 3:11-cv-515. Jordan Ridge discharges into tributaries of the New River, which joins with Clear Fork to form the Big South Fork of the Cumberland River. Jordan Ridge is now owned by a third party not subject to this Consent Decree.

b. NPDES Permit TN0076376 regulates discharges from Defendant's Mine 7 and is at issue in 3:11-cv-516. Mine 7 discharges into tributaries of Clear Fork, which joins with the New River to form the Big South Fork of the Cumberland River.

c. NPDES Permit TN0079502 regulates discharges from Defendant's Mine 14 and is at issue in 3:11-cv-527. Mine 14 discharges into Montgomery Fork, which is a tributary of the New River.

4. The Amended Complaints in each civil action allege that Defendant has failed to provide requisite non-compliance reports on its Discharge Monitoring Reports ("DMRs").

5. The Amended Complaints in Civil Action Nos. 3:11-cv-515 and 3:11-cv-527 each allege that Defendant has violated representative sampling provisions of its permits.

6. The Amended Complaint in Civil Action No. 3:11-cv-515 alleges that Defendant has violated the Clean Water Act ("CWA") and the Surface Mining Reclamation and Control Act ("SMCRA") as a result of its discharges of selenium.

7. The Parties recognize, and by entering this Consent Decree the Court finds, that the Consent Decree has been negotiated by the Parties in good faith and will avoid further

litigation among the Parties, and this Consent Decree is fair, reasonable, and in the public interest. By entering into this Consent Decree, Defendant does not admit any of the allegations set forth in the Complaints or the Amended Complaints.

NOW, THEREFORE, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the Parties and over the subject matter over these actions pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 33 U.S.C. § 1365 (the CWA citizen suit provision), and 30 U.S.C. § 1270 (the SMCRA citizen suit provision).

9.     Venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. § 1391(b) and (c) because it is the judicial district in which Defendant is located, resides, and/or does business and the judicial district in which the violations alleged in the Amended Complaints occurred. Venue is appropriate pursuant to 33 U.S.C. § 1365(c)(1) because the sources of the alleged CWA violations are located in the Eastern District of Tennessee. Venue is appropriate pursuant to 33 U.S.C. § 1270(c)(1) because the mining operations at issue are located in the Eastern District of Tennessee.

10.     For purposes of this Consent Decree, or any action to enforce this Consent Decree, Defendant consents to this Court's jurisdiction over this Consent Decree and consents to venue in this judicial district.

## III.     APPLICABILITY

11.     The Parties agree that Section V ("Injunctive Relief") will only apply to discharges from Mine 7 and Mine 14, and not to Jordan Ridge as Jordan Ridge is now owned by a third party not subject to this Consent Decree.

3

12. Unless otherwise specified in this Consent Decree, no future transfer of ownership of Mine 7 or Mine 14 shall relieve Defendant of its obligations to ensure that the terms of this Consent Decree relating to Mine 7 and Mine 14 are implemented, unless prior to any transfer, Defendant shall provide a copy of this Consent Decree to the proposed transferee and require the transferee to provide written confirmation to the Court acknowledging the terms of the Consent Decree and that the transferee will be bound by those terms. In such event, Defendant shall no longer be subject to this Consent Decree. There shall be no requirement to provide written confirmation to the Court if the ultimate parent of Defendant will change as a result of any transaction but Defendant owning or operating the facility will not change. In any event, unless specified in this Decree (for example, without limitation, as provided in this paragraph 12 and in paragraphs 30 and 31 below), all transferees, subsequent owners, and operators shall be bound by the terms of this Consent Decree relating to Mine 7 and Mine 14 consistent with applicable law. This paragraph is not applicable to any party other than Defendant (i) applying for a new permit for the extraction of coal at Mine 7 or Mine 14 and/or (ii) conducting non-extractive activities under existing permits and leases at Mine 7 or Mine 14 including, without limitation, use of surface for haul roads and other operations and infrastructure supporting coal extraction at other mine locations or at Mine 7 or Mine 14 (under new permits for the extraction of coal there). Also, to the extent any lessor claims that any term of this Consent Decree or compliance herewith constitutes a default under a lease that would allow the lessor to forfeit the lease or recover damages (a "Claim of Default"), then the term or compliance upon which the Claim of Default is based shall not apply to that lease held by Defendant. Upon becoming aware of the Claim of Default, Defendant shall promptly provide Plaintiffs notice of the excluded term or provision of the Consent Decree and any lease and/or permit impacted by it. Defendant shall

4

provide additional notice at least ten (10) days prior to commencing any activity on this lease that would have otherwise been prohibited by such term or compliance.

## IV.    DEFINITIONS

13.    Wherever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Amended Complaint" shall mean the First Amended Complaint for Declaratory and Injunctive Relief and Civil Penalties filed in Civil Action Nos. 3:11-cv-515, 3:11-cv-516, and 3:11-cv-527 on November 8, 2012.

b.    "Consent Decree" or "Decree" shall mean this Consent Decree.

c.    "Parties" shall mean Plaintiffs collectively and Defendant.

d.    "Jordan Ridge" shall refer to the facility authorized to discharge effluent into waters of the United States and Tennessee pursuant to NPDES Permit TN0062961 and now owned by a third party not subject to this Consent Decree.

d.    "Mine 7" shall refer to the facility authorized to discharge effluent into waters of the United States and Tennessee pursuant to NPDES Permit TN0076376.

e.    "Mine 14" shall refer to the facility authorized to discharge effluent into waters of the United States and Tennessee pursuant to NPDES Permit TN0079502.

## V.    INJUNCTIVE RELIEF: SELENIUM LIMITS AND PERMIT LIMITS COMPLIANCE

14.    This Consent Decree in no way affects or relieves Defendant of its responsibility to comply with applicable federal, state, and local laws regulations and permits.

15.    No later than 270 days from the Effective Date of the Consent Decree (as defined in Section XIII), Defendant shall be in compliance with applicable permit limits for pH, iron,

5

manganese, total suspended solids ("TSS"), and/or suspended solids contained within NPDES permits TN0076376 and TN0079502. Defendant may choose its method of compliance.

16.    If Defendant does not comply with the terms of Paragraph 15, Defendant will be subject to stipulated penalties outlined in Section VII of this Consent Decree.

17.    Defendant agrees that no later than 180 days from execution of the Consent Decree by the Parties or 60 days from the Effective Date of this Consent Decree, whichever occurs later, it will submit a request for changes to NPDES Permit TN0076376 to the Tennessee Department of Environment and Conservation ("TDEC"), and specifically request selenium limits of 5 μg/L (monthly average) and 20 μg/L (daily maximum) on the following outfalls: L5A, JH2, JH1, L23, JH4, DW2, and GB3.

18.    The Parties agree that the limits established by TDEC as a result of the requested changes in Paragraph 17 of this Decree shall be binding and enforceable from the date upon which such requested changes are made.  Defendant expressly and knowingly waives its right to contest or appeal these limits and their enforceability, including but not limited to contesting the enforceability of the limits on the basis of any substantive or procedural defect in the permitting process.

## VI.    DISMISSAL OF PERMIT APPEALS

19.    The Parties agree to dismiss with prejudice all of their respective administrative appeals of NDPES Permit TN0076376 currently pending before the Board of Water Quality, Oil and Gas Board in Case No. WPC11-0103, APD Docket No. 04.30-112147A.

## VII.    STIPULATED PENALTIES

20.    In addition to any other remedies available at law or equity, if Defendant fails to pay the $6,000 civil penalty or make a $54,000 payment to the Supplemental Environmental

6

Project ("SEP") when due as set forth in Sections VIII and IX, Defendant shall pay a stipulated penalty of three thousand dollars ($3,000) per day for each day that the payment is late.

21.     If Defendant fails to comply with Paragraph 15, Defendant shall be liable for stipulated penalties in the following amounts:

      a.  For the first month of violation of a parameter at an outfall, a penalty of five hundred dollars ($500) for each violation of the daily maximum limit and a penalty of one thousand dollars ($1,000) for each violation of the monthly average limit.

      b.  For the second month of violation of a parameter at an outfall, a penalty of one thousand dollars ($1,000) for each violation of a daily maximum limit and two thousand dollars ($2,000) for each violation of a monthly average limit.

      c.  For the third and any successive violations of a parameter at an outfall, a penalty of two thousand dollars ($2,000) for each violation of a daily maximum limit and three thousand dollars ($3,000) for each violations of a monthly average limits.

22.     When two consecutive monthly DMRs show compliance for a parameter, any future violations will start at the first violation and progress as in (i), (ii), and (iii) of Paragraph 21 of this Decree.

23.     Defendant shall submit stipulated payments due under this Section at the end of the thirty (30) day period following the conclusion of each calendar quarter (i.e., on April 30, July 31, October 31, and January 31). Defendant shall make payments of ninety percent (90%) of this amount to the Tennessee Parks and Greenways Foundation in the manner specified in

7

Paragraph 27 of this Consent Decree. Defendant shall make payments of ten percent (10%) of the amount due to the United States Treasury in the manner described in Paragraph 24. Written Notice of such payment shall be sent to Plaintiffs no later than 30 days after such payment is made.

## VIII.   CIVIL PENALTY

24.     Defendant shall pay a civil penalty in the amount of $6,000 to the United States as set forth in Paragraph 25 below.  Together with the SEP to be funded as set forth in Section IX, the payment of this civil penalty is made in settlement of all Plaintiffs' claims in this action under CWA for violations occurring prior to the Effective Date of this Consent Decree.

25.     Defendant shall pay the civil penalty due to the United States Treasury within thirty (30) days of the Effective Date of this Consent Decree.  That payment shall be made by certified check, bank check, or money order to the Treasurer of the United States and should be sent to the following address: Debt Collection Specialist, Environment and Natural Resources Division, Executive Office, P.O. Box 775, Ben Franklin Station, Washington, D.C. 20044-7754. The check or money order shall reference *Sierra Club et al v. National Coal, LLC*, Civil Action Nos. 3:11-cv-515, 3:11-cv-516, and 3:11-cv-527 (E.D. Tenn.). Payment shall be considered paid upon mailing, or direct delivery to the specified address. A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made, and shall state that payment is being made pursuant to this Decree.

## IX.     SUPPLEMENTAL ENVIRONMENTAL PROJECT

26.     In addition to the civil penalty set forth in Section VIII above, Defendant shall pay a total of $54,000 to the Tennessee Parks and Greenways Foundation in order to fund a SEP described in appendix A to this Consent Decree.

8

27. Defendant shall remit the funds identified in Paragraph 26 above by certified check, bank check, or money order to the Tennessee Parks and Greenways Foundation within thirty (30) days of Effective Date of this Consent Decree. Defendant shall send the funds to the following address: Tennessee Parks and Greenways Foundation, 117 30th Ave South, Nashville, TN 37212. The check or money order shall reference *Sierra Club, et al. v. National Coal, LLC*, Civil Action Nos. 3:11-cv-515, 3:11-cv-516, and 3:11-cv-527, and payment shall be considered complete upon mailing, or direct delivery to the specified address. A copy of the check and cover letter shall be sent to Plaintiffs at the time payment is made and shall state that payment is being made pursuant to this Consent Decree.

## X. INJUNCTIVE RELIEF—CESSATION OF CERTAIN MINING OPERATIONS

28. Defendant agrees that within ninety days (90 days) of the Effective Date of this Consent Decree it will cease mineral extraction at Mine 7 and Mine 14.

29. Defendant further agrees that it will complete reclamation at both Mine 7 and Mine 14. Reclamation shall be considered complete when Defendant is released from obligations under its NPDES and SMCRA permits for each site.

30. Defendant agrees that it will cease being the operator at its non-deep mining permitted sites in Tennessee by phasing out its operations at its non-deep mining permitted sites in Tennessee. Specifically, Defendant agrees that after completion of operations at Mine 7 and one additional mine—Mine 3B—that it will not seek any new permits or coal leases for the surface mining of coal and that it will not conduct operations by non-deep mining methods except at these two sites

31. The restriction in Paragraph 30 does not apply to Defendant's parents or related organizations or to third parties that acquire all or part of Defendant's right, title, and interest in coal reserves in Tennessee.

9

## XI.    COSTS

32.     Within sixty (60) days of the Effective Date of this Consent Decree, Defendant shall pay an amount of $232,000 to Plaintiffs in consideration and settlement of any claim of Plaintiffs for attorneys' fees, expert witness fees, costs and expenses incurred up to and through the date of April 29, 2013 in this litigation, in accordance with the fee shifting provisions of the CWA and SMCRA.  Payment shall be made by certified check, bank check, or money order and sent to the following address: Appalachian Mountain Advocates, P.O. Box 507, Lewisburg, WV 24901.  Payment shall be considered paid upon mailing or direct delivery to the specified address.

33.     Nothing in this Consent Decree shall prevent Plaintiffs from seeking any costs or fees incurred in this litigation after April 29, 2013, including costs and fees associated with the drafting, execution, implementation, and enforcement of this Consent Decree. Defendant shall not unreasonably reject an offer from Plaintiffs for any costs or fees incurred in this litigation after April 29, 2013, averting the need for additional litigation.

## XII.    EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

34.     Plaintiffs agree that this Decree resolves all litigation against Defendant its parents or related corporate entities related to the sites that are part of this lawsuit, including claims against Defendant for which notices of intent to sue have been sent as of April 30, 2013. The relief specified in the Consent Decree shall be the only relief available to Plaintiffs from Defendant, its parents, or related corporate entities for allegations made against Defendant in pending litigation or notice letters sent as of April 30, 2013 related to the sites that are part of this lawsuit.

35.     Nothing in this Consent Decree shall prevent Plaintiffs from challenging future permit applications or future activity by Defendant subject to the CWA and SMCRA.  Plaintiffs

agree, however, that before initiating any new litigation related to selenium or selenium limits at Mine 7, they will provide ninety (90) days of written notice rather than the typical sixty (60) days required by the CWA and SMCRA to Defendant and that they will meet and confer with Defendant's representative(s).

36. This Consent Decree shall not be constructed to create rights in or grant any cause of action to any third party not a party to this Consent Decree.

## XIII. EFFECTIVE DATE

37. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter this Consent Decree is granted, whichever occurs first, as recorded on the Court's docket.

## XIV. DISPUTE RESOLUTION

38. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism for the Parties to resolve all of their disputes arising under or with respect to this Consent Decree. The complaining Party's failure to seek resolution of a dispute under this Section shall constitute waiver and shall preclude that Party from raising any such issue or defense to enforce any obligation arising under or with respect to this Consent Decree.

39. Any dispute the Parties have that is subject to Dispute Resolution shall first be the subject of informal negotiations. The dispute shall be considered to have arisen when one Party sends the other Party a written Notice of Dispute, pursuant to Section XVII ("Notice"). Such Notice of Dispute shall state clearly the matter in dispute. The period of informal negotiations shall not exceed twenty one (21) days from the date the dispute arises, unless that period is modified in writing by the Parties. If the Parties cannot resolve a dispute by informal

11

negotiations, then the complaining Party shall file with the Court a motion for judicial resolution of the dispute.

40.     In any dispute submitted to the Court for resolution pursuant to this Section, Defendant shall have the burden of proving by a preponderance of evidence that Plaintiffs' position is not in accordance with the objectives of this Consent Decree and the CWA, and that Defendant's position will achieve compliance with the terms of this Consent Decree and the CWA.

41.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Defendant under this Consent Decree. Stipulated penalties and interest, if applicable to the disputed matter, shall continue to accrue from the first day of violation, but payment shall be stayed pending resolution of the dispute. If Defendant does not prevail on the disputed issue, stipulated penalties, and interest, if applicable, shall be assessed and paid as provided in Section VII ("Stipulated Penalties").

## XV.     RETENTION OF JURISDICTION

42.     The Court shall retain jurisdiction over this case until termination of this Consent Decree for purpose of resolving disputes arising under this Consent Decree that are not resolved in accordance with the procedures provided in Section XIV ("Dispute Resolution") and for purpose of entering orders modifying this Consent Decree pursuant to Section XVIII ("Modification") or effectuating or enforcing compliance with the terms of this Consent Decree.

43.     Plaintiffs and Defendant reserve all legal and equitable rights and defenses available to them to enforce or defend the provisions of this Consent Decree.

## XVI.    FORCE MAJEURE

44.     "Force majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of Defendant, of any person or entity controlled by

12

Defendant, or of Defendant's contractors or consultants, that delays or prevents the performance of any obligation under this Consent Decree despite Defendant's best efforts to fulfill the obligation. The requirement that Defendant exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event (a) as it is occurring and (b) after it has occurred to prevent or minimize any resulting delay to the extent possible. "Force majeure" does not include financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any obligation under this Consent Decree, whether or not caused by a force majeure event, Defendant shall provide notice to Plaintiffs, as specified in Section XVII ("Notice"), within 72 hours of when Defendant first knew or should have known that the event might cause a delay. Within three (3) days after the initial notice, Defendant shall provide in writing to Plaintiffs, in accordance with Section XVII, an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; Defendant's rationale for attributing such delay to a force majeure event if they intend to assert such a defense; and a statement as to whether, in the opinion of Defendant, such event may cause or contribute to an endangerment to public health, welfare or the environment. Plaintiffs may extend the time within which notice must be given. No such extension shall be effective unless it is in writing. Defendant shall include with any written notice required by this Section all available documentation supporting the claim that the delay was attributable to a force majeure event, and such notice shall be signed and certified as set forth in Section XVII of this Consent Decree. Failure to comply with the requirements of this

13

Section shall preclude Defendant from asserting any defense of force majeure for that event, and for any additional delay caused by such failure. Defendant shall be deemed to know of any circumstance of which Defendant, any person or entity controlled by Defendant, including Defendant's contractors and consultants, knew or should have known.

46.     If Plaintiffs agree that the delay or anticipated delay is attributable to a force majeure event, the time for performance of the obligations under this Consent Decree that are affected by the force majeure event may be extended by Plaintiffs for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure event shall not, of itself, extend the time for performance of any other obligation.

47.     If Plaintiffs do not agree that the delay or anticipated delay has been or will be caused by a force majeure event, or does not agree to the extension of time sought by Defendant, then Plaintiffs' position shall be binding, unless Defendant invokes dispute resolution under Section XIV of this Consent Decree.

48.     If Defendants invoke dispute resolution under Section XIV of this Consent Decree, Defendant shall have the burden of demonstrating that the delay or anticipated delay has been or will be caused by a force majeure event; the number of days of delay or anticipated delay that was or will be caused by such force majeure event; that the duration of the delay or the extension sought was or will be warranted under the circumstances; that Defendant could not have foreseen and prevented such delay; that Defendant, including its contractors and consultants, exercised best efforts to prevent, avoid, minimize and mitigate the delay and its effects; and that Defendant complied with the requirements of this Section.

14

## XVII. NOTICE

49.     All notices and communications required under this Consent Decree shall be made to the Parties through each of the following persons and addresses:

        a.  TO PLAINTIFFS:

            SIERRA CLUB
            STATEWIDE ORGANIZING FOR COMMUNITY EMPOWERMENT
            TENNESSEE CLEAN WATER NETWORK
            c/o J. Michael Becher
            *Counsel*
            P.O. Box 507
            Lewisburg, WV 24901

        b.  TO DEFENDANT:

            NATIONAL COAL, LLC
            c/o A.J. Dudley
            General Counsel of Litigation and Risk Management
            302 South Jefferson Street
            Roanoke, VA  24011

            and

            NATIONAL COAL, LLC
            c/o Stephen W. Ball
            Vice President of Operations
            302 South Jefferson Street
            Roanoke, VA  24011

50.     Any party may, by written notice to the other party, change its designated notice recipient or notice address provided above.

51.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVIII. MODIFICATION

52.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by all Parties or upon motion properly presented to the Court.  Where the

15

modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the Court.

## XIX. SIGNATORIES/SERVICE

53. Each undersigned representative of Plaintiffs and Defendant certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

## XX. INTEGRATION

54. This Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. Other than deliverables that are subsequently submitted and approved pursuant to this Consent Decree, no other document nor any representation, inducement, agreement, understanding, or promise constitutes any part of this Consent Decree or the settlement it represents, nor shall it be used in construing the terms of this Consent Decree.

## XXI. FINAL JUDGMENT

55. Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court as to Plaintiffs and Defendant. The Court finds that there is no just reason for delay and, therefore, enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXII. FINAL COMPLIANCE AND TERMINATION OF THE CONSENT DECREE

56. The Parties agree that compliance with Section V of this Decree has been met and this Consent when there are six consecutive months—during the period of December 1 through June 30—in which no exceedances of pollutant limits (described in Section V) occur or TDEC no longer requires any additional sampling for said outfall.

16

57.     The Consent Decree shall terminate when all conditions and obligation of the Decree are satisfied.

ENTERED this 11th day of September, 2013.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE

/s/ J. Michael Becher_____        Dated: June 25, 2013_____

J. Michael Becher
Joseph M. Lovett
Appalachia Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
304-382-4798
mbecher@appalmad.org

and

Mary Eugenia "Gena" Lewis
Law Office of Gena Lewis
P.O. Box 6004
Maryville, TN  37802
Phone: 865-978-6004
Fax: 865-978-6605
maryeugenialewis@yahoo.com
*Counsel for Plaintiffs Sierra Club, Statewide Organizing for*
*Community eMpowerment, Tennessee Clean Water Network*


/s/ William L. Penny_____        Dated: June 25, 2013_____

Corinne E. Martin
William L. Penny
STITES & HARBISON, PLLC
SunTrust Plaza, Suite 800
401 Commerce Street
Nashville, TN  37219-2376
Telephone:  (615) 244-5200
bill.penny@stites.com
cmartin@stites.com

and

W. Blaine Early, III
STITES & HARBISON, PLLC
250 W. Main Street, Suite 2300
Lexington, KY  40507
Telephone: 859-226-2284
bearly@stites.com
*Counsel for Defendant, National Coal, LLC*

18

**Appendix A:**
**Land Acquisition Project Description**

Sierra Club, Tennessee Clean Water Network ("TCWN"), and Statewide Organizing for Community eMpowerment ("SOCM"), in cooperation with Tennessee Parks and Greenways Foundation, have developed this land acquisition project description to guide the use of funds provided by National Coal LLC in settlement of the Clean Water Act citizen enforcement suit brought by Sierra Club, TCWN, and SOCM. Administration of the settlement funds and coordination of the mitigation project will be carried out by the Tennessee Parks and Greenways Foundation. This Land Acquisition Project is a continuation of the Land Acquisition Project approved and funded under the Consent Decree entered in Sierra Club et al v. National Coal Corporation, No. 3:08-cv-00410 (E.D. Tenn. 2010) and will allow the Tennessee Parks and Greenways Foundation to continue acquisition of the areas described herein.

The settlement funds will be used by Tennessee Parks and Greenways Foundation in acquiring an interest in property in eastern Tennessee to be set aside in perpetuity for the purpose of watershed improvement, wildlife habitat, and/or public recreation. The property acquired through use of these funds will be held by Tennessee Parks and Greenways Foundation, or transferred to a state agency such as the Tennessee Wildlife Resources Agency or another nonprofit organization for permanent protection. At no time may any portion of the land be used for resource extraction, including, but not limited to, coal mining, hydrofracking, oil or gas drilling, gravel pits, quarries, or logging. Any interest in land acquired through these settlement funds shall be in the form of, or otherwise subject to, a permanent conservation restriction (e.g., easement) consistent with these terms.

The property acquired through use of the settlement funds will be located where the land protection will benefit the area impacted by Mine 7, Mine 14 and the Jordan Ridge Refuse Disposal Area, including the Clear Fork and New River sub watersheds or the Cumberland River watershed. In selecting the property to be acquired and protected through the use of the settlement funds, the Tennessee Parks and Greenways Foundation will apply the following selection criteria.

**I. Acquire all or part of three parcels of private land in Campbell County, Tennessee, totaling 1,858 acres**. These parcels are adjacent to the 150,000 acre North Cumberland Wildlife Management Area ("NCWMA"), and lie between the Royal Blue Wildlife Management Unit and the Sundquist Unit. The parcels are currently owned by the Eagle Ridge Conservation Group which originally planned to develop the land but is now willing to negotiate with land conservation groups or the state. These parcels are of prime interest for land protection, and their acquisition will benefit the Mine 7, Mine 14 and Jordan Ridge watersheds, because:

1. The Royal Blue WMU lies directly to the west of the parcels and contains Braden Mountain which is immediately adjacent to Mine 7. Mine 14 is located within the Royal Blue WMU and discharges into Montgomery Fork, which is a direct tributary of the New River. Jordan Ridge also discharges into direct tributaries of the New River, although the site is not located within the Royal Blue WMU. Surface waters from both Mine 7 and Braden Mountain drain into the Clear Fork watershed, which in turn drains into the Cumberland River. The drainage from the

19

NCWMA drains into the Clear Fork at a point upstream from the drainage from Mine 7 and drains into the New River both directly and through numerous tributaries. The New River joins with Clear Fork to form the Big South Fork of the Cumberland River. The acquisition of the parcels between the Royal Blue and Sundquist Units will increase the integrity of the NCWMA, and will benefit the Clear Fork and New River watersheds by providing important access for the Tennessee Wildlife Resource Agency ("TWRA") to remediate impacts from pre-SMCRA coal mining and from excessive use of off-road vehicles, and to restore the native ecosystems.

2. In addition, acquisition of the parcels for permanent protection and restoration may promote improvement of the water quality of Thompson Creek and Ollis Creek that run into Big Creek which is listed on the federal "303(d)" list of degraded streams in need of environmental reclamation. Runoff from abandoned mine lands on the parcels contributes to pH, iron, and other heavy metals in the streams at levels of concern. Once the land is protected, the TWRA may be able to obtain federal funding for abandoned mine land reclamation to correct theses environmental issues. TWRA has conducted a reclamation operation on the abandoned mine land on the NCWMA that lies on the same coal seam and affects the same streams that run through the ERCG property. Water flowing from this abandoned mine land reclamation project and into Thompson Creek was converted from a pH of 3.8 to 6.8 and had a greatly reduced content of heavy metals. TWRA has recently acquired funds to continue reclamation that affects Thompson Creek and these funds could be used on the ERCG property upon acquisition and protection.

3. Many unregulated off-road trails run through the parcels. These trails contribute to soil erosion and water quality problems. The environmental issues created by these trails would be addressed by regulation and trail maintenance to promote responsible off-road recreational use upon acquisition and protection of the parcels.

4. The parcels contain the Devil's Racetrack geological formation. This unique and recognizable rock formation of magnificent sandstone slabs juts out of the mountains, and is visible from the 135 mile marker, near Caryville, Tennessee, on Interstate 75 which runs from Florida to Michigan. Acquisition of this property would insure that this landmark is protected
5. The parcels contain a scenic double drop waterfall on Thompson Creek which would be protected and made available for public enjoyment upon acquisition.

6. The Cumberland Trail, a 300 mile long Tennessee State Scenic Trail extending from Chickamauga Chattanooga National Military Park to Cumberland Gap National Park on the Kentucky border, runs through the parcels. Currently, the Cumberland Trail is allowed to cross the parcels by a handshake agreement. If the parcels are acquired, this section of the Cumberland Trail – which offers hikers exceptionally scenic vistas overlooking Cove Lake State Park, rural Powell Valley, and Norris Lake, and a birds-eye view of the Devil's Racetrack – would be protected and preserved.

7. Flatwoods Road runs through the parcels. This road provides a major access point to the NCWMA and also contains three major parking areas which are a valuable asset for the off-road vehicle recreational community and other recreational users. Acquisition of the parcels would ensure that this road and adjacent parking areas are preserved and properly utilized.

20

8. The parcels lie within the 670,000 acre Elk Restoration Zone and contain land which could be converted to high quality wildlife habitat.

**II. Acquire a separate parcel of private land that is also adjacent to the Royal Blue Wildlife Management Unit of the North Cumberland Wildlife Management Area.** This parcel is of prime interest for land protection, and its acquisition will benefit the Zeb Mountain, Mine 14 and Jordan Ridge Watersheds, because:

1. As described above, Mine 14 is located in the Royal Blue and the Royal Blue WMU contains Braden Mountain which is adjacent to Mine 7. Surface waters from both Braden Mountain and Mine 7 drain into the Clear Fork watershed and surface waters from Mine 14 and Jordan Ridge drain into the New River Watershed. The acquisition of the parcel adjacent to the Royal Blue Unit will increase the integrity of the NCWMA and will benefit the Clear Fork and New River by providing important access for the TWRA to remediate impacts from previous coal mining and from excessive use of off-road vehicles, and to restore the native ecosystems.

2. The parcel serves as the drainage area for Thompson Creek (described above). The water quality of the Creek is currently impacted by abandoned mine lands on the parcel. TWRA has funds available to finance restoration of these mine lands and to thereby abate stream impacts once the parcel is acquired and protected.

3. The parcel is part of the viewshed of the NCWMA, and protection of the land will help preserve the quality of the scenic vistas.

4. Additional recreation opportunities may be available on the parcel once it is protected and incorporated into the NCWMA.

**III. Acquire another parcel in eastern Tennessee – preferably within the Clear Fork or New River watershed but at least within the Cumberland River watershed – whose protection will contribute to preserving or improving the health of the watershed, providing wildlife habitat, and/or providing recreational opportunities to the public**.

In no case will the Tennessee Parks and Greenways Foundation use more than 10% of the settlement funds to cover overhead costs (including staff salaries, accounting, etc.) associated with the acquisition or permanent protection of the parcels described above. This does not include legal fees, recording/title fees, or other necessary third-party costs associated with land acquisition.

All of the funds shall be expended for the purposes listed herein within five years of receipt by Tennessee Parks and Greenways Foundation. The Tennessee Parks and Greenways Foundation shall provide reports to Sierra Club, TCWN, and SOCM by January 31 of each year regarding its progress in implementing the Land Acquisition Project, including an accounting of any settlement funds expended. In the event that not all funds are used for the purposes described herein within five years, any remaining funds may, at the option of the Sierra Club, SOCM, and

TCWN, be transferred to another public or nonprofit agency to complete the project subject to the terms and conditions herein.